[Cite as *Pirozzoli v. Thornton*, 2025-Ohio-1782.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

| | |
|---|---|
| ASHLEY PIROZZOLI, | CASE NO. 2024-A-0077 |
| Petitioner-Appellee, | |
| - vs - | Civil Appeal from the Court of Common Pleas |
| TREY THORNTON, | |
| Respondent-Appellant. | Trial Court No. 2024 DR 00104 |

## OPINION AND JUDGMENT ENTRY

Decided: May 19, 2025
Judgment: Affirmed

*Thomas I. Perotti*, Perotti Law Offices, LLC, 147 Bell Street, Suite 200, Chagrin Falls, OH 44022 (For Petitioner-Appellee).

*Leslie S. Johns*, *Sagan S. Kahler*, and *Ashley L. Jones*, Ashley Jones Law, 1220 West 6th Street, Suite 303, Cleveland, OH 44113 (For Respondent-Appellant).

EUGENE A. LUCCI, J.

{¶1} Appellant, Trey Thornton, appeals the judgment of the Ashtabula County Court of Common Pleas, adopting a magistrate's decision which granted appellee, Ashley Pirozzoli, a Domestic Violence Civil Protection Order ("DVCPO"). At issue is whether Pirozzoli adduced sufficient, credible evidence to support her petition. We affirm the trial court's decision.

{¶2} On March 7, 2024, Pirozzoli filed a petition for a DVCPO, naming her former boyfriend, Thornton, as the respondent. In the petition, Pirozzoli highlighted instances of emotional and physical abuse; she additionally discussed the primary foundation for

seeking the DVCPO; namely, that Thornton shot her in the hip causing damage to her kidney, colon, and spine. After an ex parte hearing, the trial court granted the petition on the same date. On April 5, 2024, a full hearing on the petition was held at which the following evidence was received.

{¶3} Pirozzoli and Thornton were involved in a dating relationship beginning in the Fall of 2022. Pirozzoli stated the relationship ended on February 2, 2024, after the couple dated for approximately one and one-half years. According to Pirozzoli, she lived alone, and Thornton occasionally stayed with her.

{¶4} Testimony indicated the parties had a strained and tempestuous relationship. They would break up and get back together, and, according to Pirozzoli, Thornton would occasionally become violent, grabbing her and leaving bruises on her body. During arguments, he had also previously damaged or destroyed her door and television as well as threw her phone against a wall.

{¶5} Prior to the February 2 breakup, the couple met at Pirozzoli's house to make dinner together. According to Pirozzoli, during their meal prep, she made a joke about some of the carrots they were using which was directed at Thornton. He became angry and, even though she apologized, Thornton remained incensed. Pirozzoli left her home to "let him calm down," but upon her return, Thornton was still irritated. Thornton ended up leaving the home, and the couple decided to break up again.

{¶6} The next day, Thornton was "blowing up" Pirozzoli's phone because they were scheduled to meet. She eventually picked up the call, but Thornton again became angry. Pirozzoli attempted to assuage his irritation, but it did not work. They each agreed,

Case No. 2024-A-0077

however, to meet at a McDonald's in Geneva, Ohio. Once they arrived, Thornton entered Pirozzoli's vehicle.

{¶7} Pirozzoli had just purchased a firearm but had not obtained any ammunition for the gun. According to Pirozzoli, her firearm was still in the box because she had just bought it. The two were in Pirozzoli's vehicle but were not arguing; Pirozzoli testified that Thornton was "infatuated with wanting to see [her] gun," but she did not let him. Finally, after discussing the breakup, Pirozzoli relented and allowed Thornton to see the firearm. Thornton, however, picked up Pirozzoli's firearm, returned to his vehicle, and filled the magazine with cartridges. Upon re-entering Pirozzoli's vehicle, Thornton had both Pirozzoli's fully loaded firearm as well as his personal firearm, which was loaded.

{¶8} Pirozzoli testified that as the couple conversed, Thornton "started playing around with the guns." As she was looking out the front window, she heard a loud, ringing noise; she looked down at her hip and realized she was shot. Thornton, apparently alarmed, asked Pirozzoli if she could move. She responded "no." She heard him say "my life's over," and he exited the vehicle, removed Pirozzoli to the passenger seat and drove her to the hospital. During their trip to the hospital, Thornton was frantically restating, "I'm going to marry you. I swear to God on my life, I'm going to marry you."

{¶9} When they arrived at the hospital, Pirozzoli was placed on a gurney by emergency responders. After approximately 30 minutes, Thornton visited Pirozzoli and entreated her to tell police he did not shoot her. Pirozzoli asked whether Thornton had called her family, and he responded in the negative. He represented he had first contacted his reservist, because he was in the military. Pirozzoli asked him to call her mom because officers would not let her have her phone because it was being withheld as evidence.

Apparently, Thornton attempted to call Pirozzoli's mother, but she did not answer. It is unclear whether Thornton called anyone else in Pirozzoli's family at that time, but Pirozzoli asserted her parents did not know of the incident before she was life-flighted to a different hospital.

{¶10} Ultimately, Thornton's father arrived at the hospital to pick him up. Pirozzoli later learned Thornton advised police that Pirozzoli accidentally shot herself.

{¶11} After diagnostics were finalized, Pirozzoli testified that the bullet entered through her hip and exited through her left back area. The shot caused damage to her colon, kidney, and spinal vertebrae. She was hospitalized for three weeks, and the injury caused her to have five surgeries. She still has trouble walking.

{¶12} Thornton introduced several exhibits, one of which was a partial recording of an argument between him and Pirozzoli that occurred sometime in December 2023. The recording indicated that Pirozzoli was the aggressor in the argument and seemingly threatened Thornton. The recording, however, was incomplete and it was unclear how the altercation began.

{¶13} After the full hearing, the magistrate issued the DVCPO. The magistrate's decision, filed on May 7, 2024, instructed Thornton that objections must be filed within 14 days. Twenty-one days later, Thornton filed objections to the magistrate's decision. The trial court entertained the objections, and, on September 6, 2024, the court overruled the objections and adopted the magistrate's decision concluding that the DVCPO will remain in effect until March 7, 2029. This appeal follows.

{¶14} Thornton's assignment of error provides:

Case No. 2024-A-0077

**{¶15}** "The trial court abused its discretion when it granted a domestic violence protection order against appellant as insufficient evidence existed to support the finding."

**{¶16}** "A petitioner seeking a domestic violence civil protection order under R.C. 3113.31 bears the burden of proof by a preponderance of the evidence . . . ." *Hynd v. Roesch*, 2016-Ohio-7143, ¶ 17 (11th Dist.). "An appellate court will not reverse a trial court's decision to grant a civil protection order absent an abuse of discretion." *DiVincenzo v. DiVincenzo*, 2023-Ohio-570, ¶ 27 (11th Dist.), citing *Deacon v. Landers*, 68 Ohio App.3d 26, 31 (4th Dist. 1990); and *Tredenary v. Fritz*, 2017-Ohio-8632, ¶ 23 (11th Dist.).

**{¶17}** R.C. 3113.31(A) provides:

(1)    "Domestic violence" means any of the following:

(a)    The occurrence of one or more of the following acts against a family or household member:

(i)    Attempting to cause or recklessly causing bodily injury;

(ii)    Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;

(iii)    Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;

(iv)    Committing a sexually oriented offense.

(b) The occurrence of one or more of the acts identified in divisions (A)(1)(a)(i) to (iv) of this section against a person with whom the respondent is or was in a dating relationship.

**{¶18}** Reckless mental culpability is defined under R.C. 2901.22(C), which provides as follows:

Case No. 2024-A-0077

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶19} In issuing the DVCPO, the magistrate underscored his position that Pirozzoli's testimony was more credible than the evidence presented in Thornton's defense. The magistrate determined, in light of the facts:

Thornton engaged in domestic violence when he shot Pirozzoli. It is undisputed that the gunshot he fired caused bodily injury to Pirozzoli. Further, his handling of the weapon was reckless. Carelessly handling a loaded firearm while in a vehicle in such a way that it would fire demonstrates Thornton's heedless indifference to the consequences and substantial risks of his actions. . . .

Pirozzoli also has reasonable cause to fear the existence of domestic violence. Thor[n]ton has a history of abusive behavior towards Pirozzoli, leaving bruises on her body and destroying her property. On February 3, 2024, after multiple, recent arguments with Pirozzoli, Thornton escalated his abuse and shot her. After being shot, Pirozzoli turned to see Thornton pointing the gun straight at her.

Thornton's actions after the shooting also support the reasonableness of Pirozzoli's fear of future harm. After shooting his girlfriend, Thornton's first thought was for himself and how his life would be ruined. The injuries that Thornton caused Pirozzoli were severe, and Thornton does not show remorse for what happened. His flight from the hospital and furtive behavior regarding the shooting are indicative of guilt and an attempt to escape responsibility for his actions.

Thornton argues that, since Pirozzoli contacted him from the hospital, she could not be afraid of future harm. However, Pirozzoli explained that she was seeking an explanation for what had happened to her and why he abandoned her. Thornton also appears to argue that Pirozzoli cannot be reasonabl[y] fearful of further harm because he has not

Case No. 2024-A-0077

harmed her since the shooting. This argument is illogical. After being shot, Pirozzoli spent most of the following month in the hospital, and then promptly obtained the emergency protective order.

**{¶20}** Based upon these conclusions, the magistrate granted the DVCPO.

**{¶21}** After considering Thornton's objections, the trial court overruled the same and adopted the magistrate's decision in full. We conclude the court did not abuse its discretion in doing so.

**{¶22}** Thornton first asserts the trial court erred in adopting the magistrate's decision because the parties were not family or household members as defined under R.C. 3113.31(A). Initially, Thornton did not raise this argument in his objections to the magistrate's decision, and he is therefore precluded from raising this challenge on appeal. *See* Civ.R. 65.1(G) ("a party must timely file objections to such an order under division (F)(3)(d) of this rule prior to filing an appeal"); *see also Moyer v. Robinson*, 2023-Ohio-764, ¶ 41 (11th Dist.) ("[t]here is no provision in Civ.R. 65.1 authorizing an appellate court to review for plain error in the absence of a specific objection, as there is in Civ.R. 53(D)(3)(b)(iv)").

**{¶23}** Nonetheless, we note that R.C. 3113.31 was amended by H.B. 1, effective July 6, 2018, to include R.C. 3113.31(A)(1)(b). That subsection added those who are in a "dating relationship" to classes protected under the statute.

**{¶24}** The incident prompting Pirozzoli's ex parte petition occurred on February 3, 2024. Subsection (A)(1)(b) is consequently applicable to this matter. Further, even though the parties had technically "broken up," the statute protects individuals who both are *or were* in a dating relationship. Accordingly, even though the parties were not members of the same household, their "on-again-off-again," year-and-one-half dating relationship was

Case No. 2024-A-0077

sufficient to establish that Pirozzoli was a member of a class protected by Ohio's DVCPO statute. Thornton's argument in this regard lacks merit.

**{¶25}** Next, Thornton contends Pirozzoli failed to persuasively establish that he caused her to have physical bruising in the past or that he destroyed her property while the couple were fighting. He claims Pirozzoli did not offer any corroborating evidence of these injuries/actions. Thus, Thornton maintains Pirozzoli's credibility was dubious.

**{¶26}** The trial court granted the DVCPO based upon the domestic violence embodied in Thornton's act of shooting Pirozzoli; namely, by recklessly causing Pirozzoli physical injury. *See* R.C. 3113.31(A)(1)(a)(i) and (b). In this respect, Pirozzoli's testimony regarding prior acts of aggression serve as factual background of the parties' relationship and establish a pattern of conduct on the part of Thornton, not the principal legal conclusion that Thornton, by recklessly shooting Pirozzoli and causing her bodily injury, committed domestic violence.

**{¶27}** While corroborating evidence of Pirozzoli's claims of prior aggressive or hostile behavior may have substantiated her claims, the lack of such evidence does not, by itself, diminish her credibility. It is undisputed that Pirozzoli was shot by Thornton after he was "playing around with" the loaded firearm in a vehicle. This evidence was not contested and the magistrate, and later the trial court, deemed Pirozzoli's version of events credible. We discern no error in the magistrate's construction of the evidence and see no abuse of discretion in the trial court's adoption of the same.

**{¶28}** Additionally, it would appear Thornton is challenging Pirozzoli's failure to establish a "pattern" of conduct. Pirozzoli, however, moved for a general DVCPO, not a CPO premised upon the crime of menacing by stalking, which requires the movant to

Case No. 2024-A-0077

establish a pattern of behavior. *See* R.C. 3113.31(A)(1)(a)(ii) and R.C. 2903.211(A)(1). We acknowledge that establishing menacing by stalking under R.C. 3113.31(A)(1)(a)(ii) is sufficient to establish domestic violence under the statute; still, it is not a necessary condition. Pirozzoli was therefore not required to establish a pattern of behavior. Her testimony regarding Thornton's previous aggressions, however, serves as a foundation for her position that she has a reasonable basis to be concerned with or fear potential future volatile encounters with Thornton and nonetheless do establish a pattern of behavior.

**{¶29}** Next, Thornton claims there is no threatened existence of domestic violence or ongoing need to protect Pirozzoli from him. Building upon his previous argument, Thornton claims that "'past acts of domestic violence, without anything more, [are] not enough to warrant a present civil protection order.'" Thornton brief, p. 9, quoting *Solomon v. Solomon*, 2004-Ohio-2486, ¶ 27 (7th Dist.)

**{¶30}** Pirozzoli's testimony regarding Thornton's previous violent behavior or outbursts was not offered to establish prior acts of domestic violence. The reckless action of shooting Pirozzoli which caused her bodily injury was the foundation for the trial court's decision. In this respect, Pirozzoli met her burden of proof, and the trial court did not err in adopting the magistrate's decision.

**{¶31}** Thornton also asserts that Pirozzoli's actions of attempting to contact him from the hospital militates strongly against the need for protection or future protection. We do not agree.

**{¶32}** As the magistrate found and the trial court concluded, Pirozzoli established her attempts to contact Thornton after the incident "well-explained." Pirozzoli initially

testified that she had difficulty remembering calling Thornton after the shooting because she was on various "drugs" or medications.

{¶33} Nevertheless, she remained steadfast that her attempts to contact Thornton were based upon her desire to hear from Thornton what actually happened and why he shot her. On cross-examination, defense counsel inquired why Pirozzoli, after the "ordeal," still wanted to have contact with Thornton. Pirozzoli stated she did "not necessarily want to have contact. [She] wanted to know why it happened, because [she] was told that he was going to put - - put the blame on [her]. He told his military [reservist] and the police officers [she] shot [her]self, and [she] just wanted him to admit that it wasn't [her] . . . ."

{¶34} Further, in her narrative testimony, Pirozzoli explained her state of mind after she was admitted to the hospital and Thornton had left:

> So, it was really hard on me because I think about - - it wasn't like - - you know, it wasn't like this freak accident or anything. It was someone I cared about that was trying to hurt me. And it hurts more because I don't want - - I just - - wouldn't have thought or wanted to believe that somebody was capable of doing something so cruel to somebody. And then, like, the whole time I just - - all I wanted was just to believe that it was - - that there's just, like, good in everybody, but there's just no remorse, no nothing. Didn't even know if I was dead or alive after, after the shooting and even cared to know if I was alive. And it's just, like, I don't know how somebody could do that, because I couldn't do that to someone and run.

{¶35} Pirozzoli's testimony reflects her confusion and dismay regarding Thornton's behavior after the shooting. With this context in mind, her attempts to contact Thornton do not reflect an interest in pursuing a future association with him; to the contrary, she was upset and simply wanted answers from Thornton about his behavior during and after the event.

Case No. 2024-A-0077

**{¶36}** The findings relating to the shooting were not disputed. Surrounding issues of Pirozzoli's view of the parties' relationship and previous instances of hostility or abuse turned primarily on Pirozzoli's credibility. "'Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact.'" *In re D.H.*, 2018-Ohio-630, ¶ 18 (11th Dist.), quoting *In re West*, 2005-Ohio-2977, ¶ 37 (4th Dist.). The magistrate made specific findings that Pirozzoli's testimony was credible and the trial court, after reviewing the record, agreed with the magistrate. In particular, the trial court, in adopting the magistrate's decision determined:

> [T]he Court finds [Thornton's] arguments that he did not engage in any domestic violence to be unpersuasive. [Pirozzoli] testified that [Thornton] was violent towards her during the relationship, and the magistrate found her testimony to be credible. The Court agrees. [Thornton] also appears to assert that, because [Pirozzoli] was the alleged aggressor in a single, partially-recorded domestic violence dispute, it follows that [Thornton] never initiated or was responsible for any domestic violence incidents during the relationship. This argument is particularly unconvincing because, after an argument with her, [Thornton] shot and almost killed [Pirozzoli]; a fact which [Thornton] repeatedly downplays or omits.

**{¶37}** The trial court conducted the initial ex parte hearing and issued the DVCPO. After reviewing the entirety of the evidence, the trial court agreed with the magistrate's recommendation.

**{¶38}** One point that Thornton does not directly address is whether there was sufficient, credible evidence that his behavior at the time of the shooting was reckless. For a comprehensive analysis, we shall consider this element.

**{¶39}** The record demonstrates that Thornton was in the military, and, in her initial petition, Pirozzoli averred that Thornton owned over 20 guns, some of which he would

Case No. 2024-A-0077

keep "armed" and left in "careless places." These circumstantial points demonstrate that Thornton was more than familiar with firearms. Nevertheless, Thornton possessed both his and Pirozzoli's loaded firearms in Pirozzoli's vehicle and "started playing around with the guns." An individual in the military who also owns multiple firearms transcends mere negligence when he "plays around" with loaded guns in the confined space of a vehicle. This evidence provides a compelling basis for the conclusion that, under the circumstances, Thornton, with heedless indifference to the consequences, disregarded a substantial and unjustifiable risk that Pirozzoli (or Thornton) would be shot, i.e., Thornton acted recklessly.

{¶40} The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 1997-Ohio-260, ¶ 14. Further, "[a] trial court's factual findings must be given deference, and, as such, we will not disturb such determinations save an abuse of discretion." *Lozada v. Lozada*, 2014-Ohio-5700, ¶ 13 (11th Dist.). Given the facts and circumstances, we conclude the trial court did not err in adopting the magistrate's assessments of the relative credibility of the evidence.

{¶41} Considering the foregoing analysis, we hold the trial court did not err in adopting the magistrate's decision recommending the issuance of the DVCPO for five years.

Case No. 2024-A-0077

{¶42} Thornton's assignment of error lacks merit and the judgment of the Ashtabula County Court of Common Pleas is affirmed.


MATT LYNCH, J.,

SCOTT LYNCH, J.,

concur.

Case No. 2024-A-0077

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignment of error lacks merit. It is the judgment and order of this court that the judgment of the Ashtabula County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.

_____
JUDGE EUGENE A. LUCCI

_____
JUDGE MATT LYNCH,
concurs

_____
JUDGE SCOTT LYNCH,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2024-A-0077